## C., P. & St. L. Railway Company v. T. J. Condon, administrator.

1. PEREMPTORY INSTRUCTION—*what considered upon motion for.*
Upon such a motion only evidence tending to prove the plaintiff's case is considered; and it matters not from which party to the cause the evidence comes; nothing in rebuttal of plaintiff's case is to be considered; there is to be no weighing of proof on the respective sides.

2. VERDICT—*what does not destroy presumptions in favor of.* The presumptions which prevail in favor of the verdict of a jury are not destroyed by reason of the fact that the verdict in question was predicated solely upon evidence heard by another jury at a former trial and read upon the latter one from a transcript thereof.

3. IMPUTED NEGLIGENCE—*doctrine of, abolished.* The doctrine of imputed negligence no longer exists in this state, and especially would it not apply as between two persons traveling together in a buggy who sustained toward each other no other relation than that of common excursionists.

Action on the case for death caused by alleged wrongful act. Error to the Circuit Court of Sangamon County; the Hon. JAMES A. CREIGHTON, Judge, presiding. Heard in this court at the November term, 1904. Affirmed. Opinion filed June 7, 1905.

WILSON, WARREN & CHILD, for plaintiff in error.

SHUTT & GRAHAM, for defendant in error.

MR. JUSTICE GEST delivered the opinion of the court.

This suit is brought under chapter 70 of. the Revised Statutes charging negligence by plaintiff in error whereby the death of Alexander Moore was occasioned. Moore came to his death September 19, 1901, between .8:30 and 9 o'clock. P. M. by reason of a collision between a freight train of appellant and a conveyance in which Moore was riding. The train was backing eastward on Madison street in Springfield and at the intersection of that street with 11th street the accident happened. The first count of the declaration charges that the appellant negligently backed its train down Madison street and upon 11th street without giving any notice of its approach and struck the buggy on the crossing. The fourth

count avers failure to continuously ring the bell on the engine as required by an ordinance of Springfield. The fifth count avers failure to have a conspicuous light at the rear of the train so as to show the direction the same was moving, as required by an ordinance of the city. The ordinance set out in the fourth and fifth counts and which was duly proven is as follows: "The bell of each locomotive engine shall be rung continually while running upon any railroad track within said city; and every locomotive engine, car or train of cars, running in the night time on any railroad track in this city, shall have and keep a bright and conspicuous light at the forward end of such locomotive engine, car or train of cars. If such engine or train be backing, it shall have a conspicuous light at the rear of the engine or train, so as to show the direction the same is moving." It is unnecessary to mention the other three counts of the declaration. The cause was submitted to a jury who found for the plaintiff and assessed the damages at $3,000 and the court entered judgment on the verdict. At the close of all the evidence the defendant moved the court to instruct the jury to find the defendant not guilty but the court overruled the motion.

The grounds for reversal that are presented by counsel for appellant in their argument are, that the verdict is contrary to the evidence; that the court should have sustained their motion to instruct the jury to find for the defendant; that the court erred in giving the first instruction given for plaintiff; that the court erred in refusing to give defendant's instructions one and two. The first two grounds above stated require consideration of the evidence presented upon the trial. It is exceedingly difficult, if not impossible, to state the substance of the material evidence contained in a record so as to convey to a third person that full force of the evidence which is obtained by the reading of the whole. No two persons will state it in like manner or with the same effect.

Moore and one James Tabor lived at Athens, a place distant from Springfield about fifteen miles, and were at this time of the same age, twenty-one years. They left Athens

together September 19, 1901, about three o'clock P. M. and reached Springfield about five o'clock that afternoon; they came in a one-seated buggy drawn by two horses; Tabor drove all the time; the buggy and one of the horses belonged to Tabor, the other horse belonged to the man for whom he worked. Whether Moore or Tabor obtained the use of it on this occasion does not appear; both horses were what are called roadsters. On reaching Springfield the team was put in Myers' feed yard; Moore and Tabor remained together until they started back to Athens; they walked about the streets, talked with people they met and knew, "bummed around the square," got a bowl of soup, Moore bought a pair of shoes and in the second saloon that they visited a quart bottle of blackberry wine which was found in the inside pocket of his undercoat after the accident. They got their team again at about half past eight, drove around the square and a little on other streets, out to 11th, north on 11th to Madison where Moore was killed on the crossing.

They had been associated for years. Moore had been a coal miner for five years and had worked about livery stables. Tabor was a laborer, had worked on farms, in livery business, in company barns, and in breaking horses. There is direct evidence that they each drank on this day of intoxicating liquor three glasses of beer and no more, and there is no direct evidence that they drank any more; the last glass of beer they drank was one or two hours before they started home. Three witnesses for defendant testify that on this afternoon Tabor was drunk. Two of these witnesses were trainmen on this train; one of them says Tabor was drunk because he smelled liquor on his breath, the other simply says that Tabor was drunk, and the third, Henderson, who was hostler at the feed yard, says both Moore and Tabor were drunk when their team was hitched to start home. Henderson's character for veracity is impeached by his employer and three other witnesses. Four witnesses for plaintiff besides Tabor testify that neither Tabor or Moore was drunk but that both were sober shortly before they started for home, and it appears both were accustomed to the use

of beer. As they approached the crossing, going north, the top of the buggy was up with side curtains on; Tabor sat on the right side driving; both had their overcoats on and a lap robe over them; it was a dark, foggy, cloudy night with drizzling rain. Tabor says that as he drove north they were going at about nine miles an hour. Warner, a witness for plaintiff, says he kept store on the southeast corner of 11th and Madison streets at that time, stood in his door as the buggy passed along, that the team then was jogging along, not going fast and not on a walk. When they were half a block from the crossing, the B. & O. passenger train went over the crossing and Moore remarked, "There goes a passenger." Tabor says he kept looking out and driving on; that when the horses were about fifteen feet from the track he looked east and when the team was pretty near on to the track he looked east again and then west, heard a grumbling sound and saw a box car ten or fifteen feet to the west and coming east and the team was then upon the tracks. He struck the team with the whip, they jumped and broke the doubletree, pulled him out and over the dash board and the car passed over the buggy and Moore, killing him instantly. Tabor says that Moore sat on the side next to the box car and does not think that Moore looked at all; that Moore was sitting back with one arm about him and the other under the lap robe and the last he said was: "There goes a passenger"; that his hearing is good and no bell was rung, or whistle sounded or other warning given of the approaching train as far as he could tell; that there was no light at the end of the box car; that he looked and all he could see was the end of the car, saw no light at all; that there was no electric light at that street corner; that the passenger train they saw consisted of one engine and three coaches which was running west on the north track and was out of sight when they reached the crossing, and that the freight train which struck the buggy was running on the south track. There were eighteen or nineteen cars in this freight train averaging thirty-six feet each in length, making a train about seven hundred feet long; it was running eastward; the

engine was at the west end. There were five men on the train, the engineer Robinson, the fireman, Byrum, who were on the engine; Porter, a brakeman, and Shadow, foreman of the crew, concerning whose location on the train there is some ground for question. Porter was not a witness; he is dead. Shadow says that he and Porter were on the east end of the east car with switch lanterns in their hands which they were using for signals. Robinson, Byrum and Corbley, located about seven hundred feet away from the east car, say that Shadow and Porter were on the east car with switch lanterns. Witnesses for plaintiff, Tabor, another Robinson, Burton and Warner say that there were no lights on the east car. Warner, Robinson and Burton were on the ground standing in different spots not more than forty or fifty feet from the east car. Shadow did not see the team or buggy. One horse was gray, the other sorrel. The first knowledge he had of team or buggy was when he saw the gray horse passing north of the car and heard the grinding of the buggy under the wheels. He did not see the sorrel horse or the buggy, it was too dark to see them, all he saw was "just that white horse."

In argument of the alleged error of the court in denying appellant's motion to instruct the jury peremptorily to find for the defendant, counsel for appellant say: "The question is whether the evidence as a whole tends to prove plaintiff's claim; it is not enough that some evidence for plaintiff may be found in the record; there must be such evidence as ought reasonably to satisfy fair-minded men that plaintiff's case has been established by a preponderance." We do not so understand the law. Such a motion at the close of the evidence raises merely the question whether any evidence has been presented tending to prove a case for the plaintiff. Upon such a motion only evidence tending to prove the plaintiff's case is to be considered, and it matters not from which party to the cause the evidence comes. Nothing in rebuttal of plaintiff's case is to be considered, there is to be no weighing of proof on the respective sides. Such a motion is merely a demurrer to the evidence and demurrer admits all the

facts which the evidence favorable to the plaintiff proves or by reasonable inference tends to prove. We think the court committed no error in refusing the peremptory instruction.

Whether the verdict is contrary to the evidence is a question which requires consideration of all the evidence in the case. The cause has been several times tried. It was in this court two years ago and the judgment reversed for error in an instruction given for plaintiff. On the last trial, as appears by the bill of exceptions, no witnesses were heard by the jury but by agreement of parties the evidence heard on a previous trial was read to the jury in lieu of calling witnesses, and that fact is suggested to us as ground for placing less confidence in the verdict. Parties have the right to try causes in that way, but when they do, we are not disposed to depart from the usual rule applied to jury trials. One reason for the rule that the verdict of a jury is entitled to weight is ordinarily stated to be because they see and hear the witnesses, but that is far from being the only ground for the rule that the verdict of twelve men from the various walks of life is entitled to great consideration in both the trial courts and courts of review. It is urged that Moore personally was not exercising ordinary care, that he was guilty of negligence. After careful consideration of all the evidence we are not disposed to disturb the verdict on that ground. It is also urged that there is no proof of negligence on the part of defendant. The error in one of plaintiff's instructions which caused the reversal of the judgment in this cause by this court on its former hearing was in advising the jury as matter of law "that a railroad man's common lantern in the hands of a person on the top of a moving box car at the end of a backing train farthest from the engine is not a compliance with an ordinance which requires that a backing train shall have a conspicuous light at the rear of such train so as to show the direction in which the same is moving." This court on that hearing held, and whether rightly or wrongly is of no significance on this hearing, that the determination of that question was matter of fact to be determined by a jury and not matter of law for the court.

On the present trial that question was left to the determination of the jury by an instruction on behalf of appellant and we conclude that the jury found the defendant negligent for want of compliance with that ordinance. Our conclusion from the evidence is in entire accord with that finding of the jury, and discussion of the evidence bearing upon that subject is wholly unnecessary. It remains to consider the alleged errors in giving and refusing instructions. The first instruction given for plaintiff and of which complaint is made by appellant is as follows:

"The court instructs you that if you believe from a preponderance of the evidence in this case that Alexander Moore, deceased, was killed through the negligence of the defendant, as charged in either the first, fourth, or fifth counts of the declaration, and that he was in the exercise of due care and caution for his own safety on the occasion and at the time of such injury, then you will find your verdict for the plaintiff and assess plaintiff's damages at such sum as in your judgment under the evidence bearing upon that question will compensate the next of kin for the pecuniary loss sustained by them, if any, on account of the death of said Alexander Moore."

The first refused instruction offered by appellant, the refusal of which is urged as error, is as follows:

"The court instructs the jury that if you believe from the evidence that deceased, at or just prior to the time of the injury had by voluntary use of intoxicating drinks, become physically helpless, or had thereby so stupefied himself so that he was unable to care for himself, and if you further believe from the evidence that while deceased was in such condition, that said James Tabor undertook to care for him and carry him from Springfield to Athens in the buggy he was driving and was so undertaking at the time of the collision, then before plaintiff can recover in this case you must believe from a preponderance of the evidence that in approaching and attempting to cross said railroad tracks, said James Tabor was in the exercise of that degree of caution for the safety of deceased, which an ordinarily prudent, sober

and cautious man would have exercised for his own safety, under all the circumstances in evidence; and if you further believe from the evidence that said Tabor negligently failed to exercise such care and caution, and that such failure on the part of Tabor contributed to the cause of the death of deceased, then plaintiff cannot recover in this case, and in such case you must find defendant not guilty."

And the second is as follows:

"The court instructs the jury that if you believe from the evidence that at the time of the collision deceased had voluntarily placed his safety in the care and control of said James Tabor and permitted said Tabor to drive the horses drawing the buggy in which he was riding, before the plaintiff can recover in this case you must believe from the preponderance of the evidence, that in approaching and attempting to cross said railroad track James Tabor was in the exercise of that degree of care and caution for the safety of deceased which an ordinarily prudent and cautious man would have exercised for his own safety under all the circumstances in evidence, and unless you do so believe from a preponderance of the evidence you must find the defendant not guilty."

It is argued that the first above instruction for plaintiff is erroneous in that it omits the subject of Tabor's alleged negligence of which it is claimed there is proof sufficient to require its submission to the jury, and which it is also claimed as matter of law under the evidence in the case, is to be imputed to Moore. No other complaint against the instruction is made. The ground stated by appellant upon which negligence of Tabor should be imputed to Moore is that they planned a joint excursion to Springfield for mutual pleasure, that in all their movements they consulted the pleasure of each other, that as to the mere physical act of managing the horses Moore had submitted his physical safety to Tabor, that Moore had joint control with Tabor over the vehicle and it is also stated in italics "While Tabor was driving and he received and executed the directions of Moore" in driving, of which there appears to be no evidence

whatever. Upon these grounds counsel say: "The theory of the defense is that such facts constituted a relation between Tabor and Moore which rendered the negligence of Tabor in the management of the horses imputable to Moore." As before stated the buggy and one horse belonged to Tabor, and the natural inference from the evidence is that Tabor was the person who obtained the other horse from his employer. Tabor was driver all the time. If there be any basis in the evidence for the imputation of negligence by Tabor to Moore it must arise out of some relation existing between them. It is difficult to understand what counsel mean by joint control. There cannot well be joint control of a team while it is going; the driver must then control. Joint control is one thing and equal right to control is another. Suppose that the team and buggy were jointly owned by Moore and Tabor; there would be equal right to control; and suppose under such conditions that Tabor was driving, a contract implied by the law immediately arose requiring Tabor to use reasonable care for the safety of Moore, and if Tabor by his negligence violated that contract and Moore was thereby injured a cause of action immediately arose in Moore's favor against Tabor. If Moore owned the entire right or if Tabor owned it and Tabor was driving, the same duty and liability would arise. If Moore were the master and Tabor the servant the same implications would arise, and if under any such circumstances Moore was injured by the joint operation of Tabor's negligence and appellant's negligence both Tabor and appellant would be liable to Moore for the injury. Moore was bound to use due care for his own safety; if he was guilty of negligence in any of the ways in which it could be manifested and which contributed to his death there could be no recovery in this case, but in some form Moore himself must be guilty of negligence. If, for instance, Tabor were drunk at the time and his drunkenness caused him to be negligent and thereby Moore was killed, and Moore knew of his drunkenness and consequent unfitness to drive or in the exercise of reasonable care should have known it, then Moore would

be guilty of negligence in riding with such a driver, but his negligence would be his own, not Tabor's imputed to him. Other illustrations of like character and 'effect will occur to any lawyer. A wholly different question would arise if while they were riding together under any of the supposed conditions a person on the highway was run over by the team by reason of the negligent driving and thereby injured. In such case if Moore were master and Tabor servant, Moore as master would be liable to the person injured and by reason of the imputation of Tabor's negligence to him. There is no such doctrine known to the law of this state as imputation of negligence except in the one case of injury to a third person by the servant of another; in such case the master is held liable, the servant's negligence is imputed to the master, however innocent the master himself may be, and that upon grounds of public policy. The doctrine is generally known under the phrase *respondeat superior*. The doctrine of imputed negligence arising out of the relation of parent and child, husband and wife and other relations of care and custody of the person of another at one time had some recognition in this state, but it has been entirely abandoned, completely exploded. Chicago City Railway Co. v. Wilcox, 138 Ill., 370; C. & A. R. R. Co. v. Vipond, 212 Ill., 199. The claim of error in refusing the two instructions offered by appellant and above quoted is based by appellant's counsel upon the same theory of imputation of negligence. They are both objectionable on other grounds but no necessity arises for their further discussion.

Perceiving no error in this record the judgment will be affirmed.

*Affirmed.*